IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| PATRICK MOE, *et al.*, | CASE NO. 5:14-cv-02197 |
| Plaintiffs, | |
| v. | HON. JUDGE DONALD C. NUGENT |
| CITY OF AKRON, *et al.*, | **AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES — CLASS ACTION** |
| Defendants, | |
| and | |
| MAYOR JEFF FUSCO (sued in his official capacity) | |
| and | |
| GREGORY KALAIL (sued in his official capacity), | |
| New-Party Defendants. | |

Plaintiffs, through their undersigned attorneys, state their Amended Complaint against Defendants City of Akron (the "City"), Mayor Jeff Fusco ("Mayor Fusco"), Former Mayor Donald Plusquellic ("Former Mayor Plusquellic"), Police Chief James Nice ("Chief Nice"), Sgt. Douglas Sandor ("Sgt. Sandor"), Former Customer Service Administrator John Eaton ("Mr. Eaton"), and Customer Service Administrator Gregory Kalail ("Mr. Kalail") as follows:

**PRELIMINARY STATEMENT**

1.      This is a case about a City policy designed systematically to seize and destroy Akron homeless citizens' shelters and other personal property in contravention of their rights under the United States and Ohio Constitutions and Ohio statutory law.

2.      In a series of raids occurring between 2013 and 2014, the Akron Police Department ("APD"), with the assistance of the Akron Department of Public Service ("ADPS") and community-service crews overseen by the ADPS, seized and destroyed property without sufficient notice to Plaintiffs, or with no notice at all.  These events were part of a policy and practice designed and implemented by the City.

3.      Plaintiffs bring this action based on three categories of claims: (a) claims under 42 U.S.C. § 1983 to vindicate rights protected by the Fourth and Fourteenth Amendments to the United States Constitution; (b) claims for the City's violations of Article One, Sections Fourteen, Sixteen, and Nineteen of the Ohio Constitution; and (c) claims for the City's violations of Ohio Rev. Code § 737.29.

**JURISDICTION AND VENUE**

4.      This Court has jurisdiction over Plaintiffs' claims for violations of their federal constitutional rights, under 28 U.S.C. § 1331 (federal-question jurisdiction) and 28 U.S.C. § 1343(a)(3) (jurisdiction over federal constitutional claims).  This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because these claims arise out of the same set of facts as the federal claims such that all claims form part of the same case or controversy.

5.      Venue lies in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district.

**PARTIES**

**The Plaintiffs**

6.      Patrick Moe is a 46-year-old military veteran who has been a homeless citizen in Akron at various times for the past four years, including during the period of time relevant to this lawsuit, at times living in a tent shelter.  Mr. Moe is at risk for being homeless again in Akron at some point in the future.

7.      Robert Blosser was a 53-year-old man who was a homeless citizen in Akron at various times for the past six years, at times living in a tent shelter.  Mr. Blosser is deceased at the time of filing this Amended Complaint.[1]

8.      James Bratcher is a 23-year-old man who has been a homeless citizen in Akron at various times for the past three years, at times living in a tent shelter. Mr. Bratcher is at risk for being homeless again in Akron at some point in the future.

9.      William Buker is a 64-year-old man who has been a homeless citizen in Akron at various times for the past two years and a half and remains homeless.  At times, Mr. Buker has lived in a tent shelter.

10.     Dean Cosgray is a 47-year-old man who has been a homeless citizen in Akron at various times for the past eight years, at times living in a tent shelter. Mr. Cosgray is at risk for being homeless again in Akron at some point in the future.

11.     Nicole Gould is a 31-year-old woman who has been a homeless citizen in Akron at various times for the past four years, at times living in a tent shelter.  Ms. Gould is at risk for being homeless again in Akron at some point in the future.

---

[1] Plaintiffs filed a Notice of Suggestion of Death on August 26, 2015 and served it on Mr. Blosser's estate on August 28, 2015.  Mr. Blosser's estate has until November 27, 2015, to intervene on his behalf if it wishes to do so; if not, he will be dismissed from the action. *See* Fed. R. Civ. P. 25(a)(1).

12.     Carl Lynch is a 65-year-old man who has been a homeless citizen in Akron at various times for the past three years, at times living in a tent shelter.  Mr. Lynch is at risk for being homeless again in Akron at some point in the future

13.     George Suppan is a 56-year-old man who has been a homeless citizen in Akron at various times for the past three years, at times living in a tent shelter. Mr. Suppan is at risk for being homeless again in Akron at some point in the future.

14.     Melvin Thompson is a 45-year-old man who has been a homeless citizen in Akron at various times for the past three years, at times living in a tent shelter.  Mr. Melvin is at risk for being homeless again in Akron at some point in the future.

15.     Cody Usner is a 24-year-old man who has been a homeless citizen in Akron at various times for the past four years, at times living in a tent shelter.  Mr. Usner is at risk for being homeless again in Akron at some point in the future.

### The Defendants

16.     Defendant City of Akron is a municipal entity.  Upon information and belief, the City is responsible for establishing policies, procedures, and training materials for the APD and ADPS.

17.     Mayor Fusco is the mayor of the City and has so served since June 2015. Plaintiffs sue him in his official capacity for the declaratory and injunctive relief sought in this Complaint.  As the mayor, he has been vested with policymaking authority for the City.  By law, executive power of the city is vested in the mayor, and the mayor has the authority to appoint and remove other city policymakers.  Ohio Rev. Code § 733.01; *id.*, § 733.03.  As the mayor, Mayor Fusco is recognized as the "official head of the City" by the courts.  Akron City Charter § 54.

18.     Former Mayor Plusquellic is the former mayor of the City and had so served from 1987 to May 2015.  Plaintiffs sue him in his individual capacity for the damages relief

4

sought in this Complaint. At all times relevant to this Complaint and before he resigned in May 2015, he had been vested with policymaking authority for the City. As the former mayor, Former Mayor Plusquellic approved and supervised the operation of the policy and practice of conducting sweeps on homeless campsites and seizing and destroying the property of the homeless citizens without notice.

19. Chief Nice is, and at all times relevant to this Complaint has been, Chief of Police of the APD. Plaintiffs sue him in his individual and official capacities for the damages relief sought in this Complaint. Plaintiffs sue him in his official capacity for the declaratory and injunctive relief sought in this Complaint. At all times relevant to this Complaint, he has been vested with policymaking authority for the APD. As Chief of Police, Chief Nice has immediate control of the APD, including the stationing and transferring of police employees and the execution of the Mayor's rules and regulations. Akron City Charter § 68.

20. Sgt. Sandor is, at all times relevant to this Complaint has been, a Sergeant of the APD. Plaintiffs sue him in his individual and official capacities for the damages relief sought in this Complaint. Plaintiffs sue him in his official capacity for the declaratory and injunctive relief sought in this Complaint.

21. Mr. Eaton was Customer Service Administrator for the City for some of the times relevant to this Complaint. Plaintiffs sue him in his individual capacity for the damages relief sought in this Complaint.

22. Mr. Kalail is Customer Service Administrator for the City. Plaintiffs sue him in his official capacity for the declaratory and injunctive relief sought in this Complaint.

23. Defendants at all relevant times and as to all relevant actions described herein were persons acting under the color of state law.

## FACTUAL ALLEGATIONS

### The Homeless in Akron

24.     The homeless in the Akron area are estimated to include between 800 and 900 people.  The population includes both an estimated 100 to 250 chronically homeless people, who have been homeless for at least a year, and sporadically homeless people. Coalition on Homelessness and Housing in Ohio, *2013 Ohio Homelessness Report: Abridged* 2, 4 (2013).[2]

25.     Between 2007 and 2014, the number of homeless individuals in Ohio increased by 834 people or 12.1 percent. U.S. Department of Housing and Urban Development, Office of Community Planning and Development, *The 2014 Annual Homeless Assessment Report (AHAR) to Congress* 17, Ex. 2.7 (2014).[3]

26.     To meet the needs of the homeless community in Akron, private charities provide tents, tarps, sleeping bags, meals, and other essentials necessary for homeless individuals to survive in the elements.  Other charities offer transitional housing and limited homeless-shelter space.

27.     For many of the homeless, the tents are their homes, providing vital protection against the elements.  Many homeless individuals suffer from mental illness or addiction, past or present, making their sense of security critical to their daily lives.  Loss of safety, security, and items of importance are particularly harmful to the homeless population's well-being.

---

[2]     *Available at* http://www.cohhio.org/files/2013%20Ohio%20Homelessness%20 Report.pdf.

[3]     *Available at* https://www.hudexchange.info/resources/documents/2014-AHAR-Part1.pdf.

## The City's Policies on the Homeless

28.     City employees have historically informed homeless citizens that it is permissible for them to set up tents in certain locations throughout the City.

29.     But upon information and belief, beginning sometime between 2010 and 2012, business owners in the area complained to City officials and policymakers about homeless citizens living in secluded, wooded areas on the north end of town, particularly along Furnace Street and Summit Street.  Many of these business owners demanded that the APD and the Mayor's Office address the presence of the homeless.

30.     City policymakers designed a comprehensive strategy to restrict the activities of the homeless community.

31.     The City's strategy included:

    a.     more-aggressive enforcement of loitering and trespass laws;

    b.     a requirement that panhandlers obtain a license and abide by greater restrictions on their activities; and

    c.     an effort to "clean up" tented communities north of downtown Akron by seizing and destroying all items at those sites without providing adequate notice, or without any notice at all, to affected homeless citizens about the imminence of these seizures and destruction of their property.

## The City's Policy and Practice of Destroying Homeless Individuals' Property

32.     On information and belief, the City's policy and practice of destroying homeless individuals' property includes some number, or all, of the following steps:

    a.     the APD discovers a homeless tent site, either by way of a citizen's or business owner's complaint or an officer's patrol;

7

b. the APD provides a verbal warning to homeless citizens that they should leave or provides no warning at all;

c. the APD and ADPS employees communicate internally about their plan to seize and destroy the property;

d. the APD employees inform their supervisors of plans to conduct a sweep of homeless individuals' property;

e. the APD arranges for ADPS Community Service crews to provide assistance with the cleanup;

f. the APD arranges for a City-owned dump truck or privately owned vehicle to accompany them to the campsite, in order to transport homeless citizens' belongings directly from the campsite to a landfill;

g. the APD and ADPS Community Service crews arrive at a campsite, tell any homeless citizens present that they must leave but provide no information in the event the homeless citizens are not present;

h. the APD and ADPS seize and confiscate all visible property; and

i. the APD and ADPS transport the property to a landfill or otherwise destroy the property.

33. On information and belief, this policy and practice does not include:

a. notice to homeless citizens of the City's intent to seize and destroy their property;

b. an opportunity for a hearing, either prior to the seizure or prior to the destruction of property; or

c. any communication with the owners of the property notifying them of how they may reclaim any remaining property or receive compensation for property that has already been destroyed.

34.     Since at least 2013, Defendants have typically destroyed the homeless individuals' personal property immediately after seizure.

### The City Ratifies Its Policy of Seizing and Destroying
### Homeless Citizens' Property Without Notice and a Hearing

35.     Defendants have been made aware of the policy and practice of seizing and destroying homeless citizens' property without notice and a hearing, and they have ratified it by acknowledging it.

36.     Defendants have been made aware of this policy and practice, and they have ratified it by failing to investigate or stop it.

37.     Defendants have authorized their agents and spokespersons to defend this policy and practice in the media.

38.     Defendant Sgt. Sandor informed Defendant Chief Nice of efforts through early 2012 to clean up—what he characterized as—"all the garbage that is in the tent city area." (Letter from Douglas Sandor, Sergeant, Akron Police Dept., to James Nice, Chief of Police, Akron Police Dept. (Feb. 29, 2012).)

39.     Upon information and belief, Defendant Former Mayor Plusquellic was made aware of the City's policy via complaints from the community concerning the seizure and destruction of homeless citizens' property.

40.     Akron Deputy Director of Public Safety Phil Montgomery acknowledged a city "initiative" "to relocate a homeless population as they were trespassing on railroad property" in a November 2013 e-mail to multiple city recipients, including representatives of City Planning, the APD, and the Mayor's Office, as well as the Downtown Akron Partnership consortium of businesses.

41.     On information and belief, Defendant Former Mayor Plusquellic reviewed and approved City spokespersons' statements to the media defending the policy and practice as implemented in November 2013.

42.     On information and belief, all Defendants were aware that the items being destroyed constituted the homeless citizens' shelters and basic living essentials, and not merely abandoned property or trash.

43.     On information and belief, the City's policy and practice of seizing and destroying homeless citizens' property without adequate or any notice continued from 2013 until the present and will continue into the future unless enjoined by this Court.

44.     The City's policy and practice has resulted in the destruction of irreplaceable personal property.  The destroyed items include legal documents, identification, and military honors and awards.

45.     The City's policy and practice of destroying homeless people's property has left numerous homeless citizens bereft of their basic essentials of life, such as sleeping bags, tents, tarps, and clothing.  That policy and practice will continue into the future unless enjoined by this Court.

### The Property Sweeps Before November 6, 2013

46.     On information and belief, the City and its agents seized property at 18 homeless campsites in November 2010.  The City continued this effort in the years to follow.

47.     But there are marked differences between the manner in which the City and its agents conducted the November 2010 sweeps and the manner in which they conducted the sweeps in subsequent years.  For example:

        a.     In November 2010, the City and its agents provided about a week's notice to homeless individuals about the sweeps.  The City gave such

notice by posting written notice in the encampment areas using signage designed to draw homeless individuals' attention to the forthcoming sweeps. The signage was also made of material sturdy enough to endure outdoor conditions. By 2013, no such notice was provided in connection with the City's sweeps of homeless individuals' campsites.

b. In connection with the November 2010 sweeps, the City safeguarded the personal property it removed from the campsites in a designated storage location. By 2013, no such safeguarding took place in connection with the City's sweeps of homeless individuals' campsites.

48. The City's provision of notice and safeguarding of seized property in November 2010 demonstrates both the City's awareness of the propriety of these measures to protect the rights of homeless citizens and the feasibility of doing so.

49. Nevertheless, on information and belief, the City and its agents abandoned these protective measures after November 2010. For example, the City and its agents seized and destroyed property from multiple homeless campsites on or about August 27, 2013, and in September 2013 without following these protective measures of advance notice and safeguarding seized property. Both APD and ADPS participated in the seizure and destruction, under the planning and direction of Sgt. Sandor and Eaton.

50. On information and belief, those homeless individuals who were told that they could not camp in certain areas were not warned of the City's plan to seize and destroy their property, nor did the notice afford any homeless citizens an opportunity to contest the planned seizure and destruction. Rather, they received only general admonitions that they should leave their sites.

## The Property Sweeps of November 6, 2013

51.     On November 6, 2013, the City and its agents executed their policy and practice by seizing and destroying numerous homeless citizens' tents and personal belongings.

52.     Numerous homeless citizens received no advance warning or notice of the sweeps that took place on November 6, 2013.

53.     Those homeless individuals who were told that they could not camp in certain areas were not warned of the City's plan to seize and destroy property, nor did the notice afford any homeless citizens an opportunity to contest the planned seizure and destruction.  Rather, they received only general admonitions that they should leave their sites.

54.     On November 6, 2013, the City seized and destroyed homeless citizens' property at multiple campsites on the north end of Akron, including near Summit Street, Furnace Street, Howard Street, and the railroad.

55.     Defendants have defended the seizure and destruction of property as limited to removal of "trash," in apparent recognition that destroying homeless individuals' property violated their constitutional rights.  Eaton, for example, has claimed that "everything we removed from the campsites was trash."  (Def. Eaton Dep. 123:9-10. (July 24, 2015).)

56.     In fact, however, neither Eaton nor other City employees or agents actually undertook to differentiate between trash and useful property.  They simply hauled to the dump all unattended property found at the sites in question without segregating any of the items or determining that some should be saved.  They not only removed homeless individuals' tents from their campsites, but actually used the tents as containers for the items homeless individuals had safeguarded within them.

12

57.     The City's and its agents' conduct in carrying out sweeps of homeless individuals' campsites on November 6, 2013, displayed reckless or callous indifference to the federally protected rights of homeless individuals living in the City.

**The Property Sweeps After November 6, 2013**

58.     On information and belief, the City and its agents seized and destroyed property from multiple homeless campsites in or around December 2013.

59.     On information and belief, the City and its agents seized and destroyed property from multiple homeless campsites in or around March 2014.

60.     On information and belief, the City and its agents seized and destroyed property from multiple homeless campsites after March 2014.

61.     Numerous homeless citizens received no advance warning or notice of the sweeps that took place after November 6, 2013.

62.     On information and belief, those homeless individuals who were told that they could not camp in certain areas were not warned of the City's plan to seize and destroy property, nor did the notice afford any homeless citizens an opportunity to contest the planned seizure and destruction. Rather, they received only general admonitions that they should leave their sites.

63.     The City's and its agents' conduct in carrying out sweeps of homeless individuals' campsites after November 6, 2013, displayed reckless or callous indifference to the federally protected rights of homeless individuals living in the City.

**The City's Policy of Seizure and Destruction of Plaintiffs' Property Without Adequate Notice and a Hearing Deprives Plaintiffs of Shelter and Valuable Personal Items**

64.     The APD and ADPS conducted the November 6, 2013, sweep at the onset of winter.

13

65.     The APD and ADPS knew or reasonably should have known that seizing and destroying homeless citizens' shelter, clothing, and winter gear prior to dangerously cold temperatures and extreme weather conditions would leave the homeless citizens more vulnerable to harm.

66.     The APD and ADPS knew or reasonably should have known that seizing and destroying homeless citizens' shelter during all aforementioned property sweeps would also cause great harm to the Plaintiffs.

67.     The APD and ADPS knew or reasonably should have known that seizing personal documents and mementos would cause mental anguish.

68.     Defendants acted with reckless or callous indifference to the constitutional rights and survival needs of the homeless citizens living in the City.

69.     Defendants acted in explicit violation of their duties prescribed in Ohio Rev. Code § 737.29.

### Illegal Seizure and Destruction of
### Mr. Moe's Personal Belongings

70.     As a direct result of the City's policies and practices, the APD and ADPS seized and destroyed all of Mr. Moe's personal belongings including his tent, which was his residence at the time, and his financial documents, military documents, and countless personal items, during the November 6, 2013, sweep.

71.     As a direct result of the City's policies and practices, the APD and ADPS did not provide Mr. Moe with notice that his property would be destroyed.

72.     As a direct result of the City's policies and practices, the APD and ADPS did not provide Mr. Moe with an opportunity to contest the seizure and destruction of his property, nor to reclaim his property after the seizure.

14

73.     Mr. Moe has not been able to recover any of his belongings after the November 6, 2013, sweep.

74.     The APD and ADPS conducted the November 6, 2013, sweep at the onset of winter.  The APD and ADPS knew or reasonably should have known that taking shelter, clothing, and winter gear prior to dangerous temperature drops and extreme weather conditions would leave Mr. Moe more vulnerable to harm.

### Illegal Seizure and Destruction of Mr. Blosser's Personal Belongings

75.     As a direct result of the City's policies and practices, the APD and ADPS seized and destroyed Mr. Blosser's property on November 6, 2013.  The APD and ADPS seized and destroyed Mr. Blosser's tent, which was his residence at the time, and his food, his pallets, his clothing, and his tenting supplies during the property sweep.

76.     As a direct result of the City's policies and practices, the APD and ADPS never provided notice to Mr. Blosser that his property would be seized and destroyed.  The APD and ADPS also did not inform Mr. Blosser how he could object to the seizure and destruction of his property or how he could recover items after they were confiscated by APD officers.

77.     As a direct result of the City's policies and practices, Mr. Blosser did not recover any items seized by the APD and ADPS.

78.     Mr. Blosser lived in constant fear that the APD and ADPS would seize and destroy his tent and personal belongings again.

79.     Out of fear of further APD and ADPS sweeps, Mr. Blosser waited seven days before attempting to procure another tent.  He was in the freezing elements.  It was very difficult for Mr. Blosser to replace his tenting supplies, afford new clothes, and replace his government-issued documents after the sweeps.

80.     The APD and ADPS conducted the November 6, 2013, sweep at the onset of winter.  The APD and ADPS knew or reasonably should have known that taking shelter, clothing, and winter gear prior to dangerous temperature drops and extreme weather conditions would leave Mr. Blosser more vulnerable to harm.

<u>**Illegal Seizure and Destruction of**</u>
<u>**Mr. Bratcher's Personal Belongings**</u>

81.     As a direct result of the City's policies and practices, the APD and ADPS seized and destroyed Mr. Bratcher's property on November 6, 2013.  The APD and ADPS destroyed Mr. Bratcher's tent, which was his residence at the time, and his clothing, mail, and other personal effects during the property sweep.

82.     As a direct result of the City's policies and practices, the APD and ADPS did not provide Mr. Bratcher adequate notice that they intended to seize and destroy his property.

83.     The APD and ADPS never informed Mr. Bratcher how he could object to the seizure and destruction of his property or how he could recover items after they were confiscated by APD officers.

84.     As a direct result of the City's policies and practices, Mr. Bratcher could not recover any items seized by the APD and ADPS.

85.     Mr. Bratcher lives in constant fear that the APD and ADPS will seize and destroy his tent and personal belongings again.

86.     The APD and ADPS conducted the November 6, 2013, sweep at the onset of winter.  The APD and ADPS knew or reasonably should have known that taking shelter, clothing, and winter gear prior to dangerous temperature drops and extreme weather conditions would leave Mr. Bratcher more vulnerable to harm.

## Illegal Seizure and Destruction of
## Mr. Buker's Personal Belongings

87.     On or about November 5, 2013, an APD officer informed Mr. Buker of the sweep planned for the next day.  This officer advised Mr. Buker to move his tent, tarp, and personal belongings.

88.     Mr. Buker packed up his tent, tarp, and personal property, and he placed them under a tree some distance away from the campsite where the APD officer indicated the sweep would occur.

89.     Nonetheless, and as a direct result of the City's policies and practices, the APD and ADPS seized and destroyed Mr. Buker's tent, which was his residence at the time, and his tarp, sleeping bags, clothing, and phone during the November 6, 2013, sweep.

90.     As a direct result of the City's policies and practices, Mr. Buker was provided inadequate notice that his property would be seized and destroyed by the APD and ADPS.

91.     Defendants denied Mr. Buker the opportunity to contest the seizure or reclaim his property.

92.     Mr. Buker was unable to recover any of his personal items, despite attempting to do so.

93.     Two days after his property was taken, Mr. Buker went to the police station to report the seizure of his property.

94.     The APD employees informed Mr. Buker that items taken from the campsites were thrown in the dump.

95.     Mr. Buker lives in constant fear that the APD and ADPS will seize and destroy his tent and personal belongings again.

17

96.     The APD and ADPS conducted the November 6, 2013, sweep at the onset of winter.  The APD and ADPS knew or reasonably should have known that taking shelter, clothing, and winter gear prior to dangerous temperature drops and extreme weather conditions would leave Mr. Buker more vulnerable to harm.

<u>**Illegal Seizure and Destruction of**</u>
<u>**Mr. Cosgray's Personal Belongings**</u>

97.     As a direct result of the City's policies and practices, the APD and ADPS seized and destroyed Mr. Cosgray's property in September of 2013.  The APD and ADPS seized and destroyed Mr. Cosgray's tents, which were his residence at the time, and his fishing gear, sleeping bag, clothing, and important documents, including his birth certificate and his children's addresses, during the property sweep.

98.     As a direct result of the City's policies and practices, the APD and ADPS did not provide Mr. Cosgray with notice that they intended to seize and destroy his property.

99.     The APD and ADPS never informed Mr. Cosgray how he could object to the seizure and destruction of his property or how he could recover items after they were confiscated by APD officers.

100.    As a direct result of the City's policies and practices, Mr. Cosgray did not recover any items seized by the APD and ADPS.

101.    Mr. Cosgray lives in constant fear that the APD and ADPS will seize and destroy his tent and personal belongings again.

102.    The APD and ADPS knew or reasonably should have known that taking shelter, clothing, and important documents would leave Mr. Cosgray more vulnerable to harm.

### Illegal Seizure and Destruction of
### Ms. Gould's and Mr. Usner's Personal Belongings

103.    As a direct result of the City's policies and practices, the APD raided Ms. Gould's and Mr. Usner's campsite in early March 2014.

104.    The APD seized and destroyed Ms. Gould's and Mr. Usner's tent, which was their residence at the time, and their clothes, mp3 player, hospital scrubs, and personal journal.

105.    Upon information and belief, the APD continued the practice of seizing and destroying Ms. Gould and Mr. Usner's tents and other personal property in March 2014.

106.    As a direct result of the City's policies and practices, the APD did not provide notice to Ms. Gould or Mr. Usner that the APD would seize and destroy their property on either occasion.

107.    As a direct result of the City's policies and practices, the APD did not provide Ms. Gould or Mr. Usner an opportunity for a hearing or an opportunity to reclaim their property on either occasion.

108.    Ms. Gould and Mr. Usner live in constant fear that the APD and ADPS will seize and destroy their tent and personal belongings again.

### Illegal Seizure and Destruction of
### Mr. Lynch's Personal Belongings

109.    As a direct result of the City's policies and practices, the APD and ADPS seized and destroyed Mr. Lynch's property on November 6, 2013.  The APD and ADPS seized and destroyed Mr. Lynch's tents, which were his residence at the time, and his radio, sleeping bag, clothing, and important documents, including his birth certificate, during the property sweep.

110. As a direct result of the City's policies and practices, the APD and ADPS never provided notice to Mr. Lynch that his property would be seized and destroyed. The APD and ADPS never informed Mr. Lynch how he could object to the seizure and destruction of his property or how he could recover items after they were confiscated by APD officers.

111. As a direct result of the City's policies and practices, Mr. Lynch did not recover any items seized by the APD and ADPS.

112. Mr. Lynch lives in constant fear that the APD and ADPS will seize and destroy his tent and personal belongings again.

113. The APD and ADPS conducted the November 6, 2013, sweep at the onset of winter. The APD and ADPS knew or reasonably should have known that taking shelter, clothing, and winter gear prior to dangerous temperature drops and extreme weather conditions would leave Mr. Lynch more vulnerable to harm.

### Illegal Seizure and Destruction of
### Mr. Suppan's Personal Belongings

114. On or about November 5, 2013, an APD officer informed Mr. Suppan of APD's plans to conduct homeless property sweeps in the near future.

115. On the morning of November 6, 2013, the officer informed Mr. Suppan that the APD would be conducting the sweep in approximately an hour.

116. Mr. Suppan packed up his tent, tarp, and personal property, and he placed them under a tree some distance away from the campsite where the APD officer indicated the sweep would occur. Mr. Suppan did not have sufficient time to move all of his belongings to another campsite prior to the planned property sweep.

117. As a direct result of the City's policies and practices, the APD and ADPS seized and destroyed Mr. Suppan's tent, which was his residence at the time, and his

clothes, shoes, marriage and divorce papers, toiletries, jewelry, phones and chargers, and winter supplies including warm boots, during the November 6, 2013, sweep.

118.    As a direct result of the City's policies and practices, Mr. Suppan was provided with insufficient notice that his property would be seized and destroyed by the APD and ADPS, and he was not given the opportunity to contest the seizure or reclaim his property.

119.    Mr. Suppan was not able to recover any of his belongings after the sweep.

120.    Without winter gear, Mr. Suppan was exposed to the elements of the Akron fall and winter for the remainder of November, December of 2013, and January and February of 2014.

121.    As a consequence, Mr. Suppan was hospitalized for frostbite.  As a result of the frostbite, Mr. Suppan had two toes amputated.  He was hospitalized for over a month and spent significant time in a rehabilitation center afterwards, where he had to learn how to walk again.  Mr. Suppan continues to suffer severe pain in both feet and has difficulty walking and maintaining his balance.

122.    Prior to the sweep, Mr. Suppan performed odd jobs as a handyman and physical laborer.  As a result of the City's actions, he will be unable to do this kind of work again and has applied for disability benefits to meet his survival needs.

123.    The APD and ADPS conducted the November 6, 2013, sweep at the onset of winter.  The APD and ADPS knew or reasonably should have known that taking shelter, clothing, and winter gear prior to dangerous temperature drops and extreme weather conditions would leave Mr. Suppan more vulnerable to harm.

**<u>Illegal Seizure and Destruction of</u>**
**<u>Mr. Thompson's Personal Belongings</u>**

124.    As a direct result of the City's policies and practices, the APD and ADPS seized and destroyed Mr. Thompson's personal belongings from the Furnace Street area during the November 6, 2013, sweep.

125.    As a direct result of the City's policies and practices, the APD and ADPS did not provide Mr. Thompson with adequate notice that they intended to seize and destroy his property.

126.    As a direct result of the City's policies and practices, the APD and ADPS did not provide Mr. Thompson an opportunity for a hearing or the opportunity to reclaim his property.

127.    On information and belief, the APD and ADPS seized and destroyed Mr. Thompson's tent, which was his residence at the time, and his personal property that was kept at the campsite.

128.    Mr. Thompson lives in constant fear that the APD and ADPS will seize and destroy his tent and personal belongings again.

129.    The APD and ADPS conducted the November 6, 2013, sweep at the onset of winter.  The APD and ADPS knew or reasonably should have known that taking shelter, clothing, and winter gear prior to dangerous temperature drops and extreme weather conditions would leave Mr. Thompson more vulnerable to harm.

**<u>CLASS-ACTION ALLEGATIONS</u>**

130.    Plaintiffs bring this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(c)(4) on behalf of themselves and all others similarly situated, seeking equitable, declaratory, and injunctive relief.  Plaintiffs seek damages for themselves only individually and not for the class.

131.    The proposed class includes homeless individuals and families, as defined by 42 U.S.C. § 11302, located in Akron from October 1, 2013, to the present, whose property was seized and destroyed by Defendants or are at risk of having their property seized and destroyed by Defendants under Defendants' policies and practices.

132.    "Homeless" individuals and families are defined, under 42 U.S.C. § 11302, as those:

> a.    who lack a regular, fixed, and adequate nighttime residence;
>
> b.    whose primary nighttime residence is a public or private place not designed or ordinarily used as regular sleeping accommodations for human beings; or
>
> c.    who live in supervised publicly or privately operated shelters that are designated to provide temporary living arrangements.

133.    Upon information and belief, the members of the class are so numerous that individual joinder of all members of the class would be impracticable.  Current data indicates that there are between 100 to 250 chronically homeless individuals in Akron with another 600 to 700 sporadically homeless people.  Joinder is also impracticable because many of the class members are unaware of their legal rights and are unlikely to seek legal representation.

134.    Common questions of law and fact exist as to all members of the class and predominate over any questions that affect sole individual members of the class.  The questions of law and fact common to the class are:

> a.    the legality of Defendants' seizures and destruction of property owned by Plaintiffs and members of the class;

23

b.    the failure of Defendants to provide Plaintiffs and members of the class sufficient notice before the seizure and destruction of their property;

c.    the existence of the policy, pattern, and practice of Defendants to seize and destroy property owned by Plaintiffs and members of the class;

d.    whether Defendants' seizures and destruction of property owned by Plaintiffs and members of the class violate their Fourth Amendment rights to be free of unreasonable seizures;

e.    whether Defendants' seizures and destruction of property owned by Plaintiffs and members of the class violate their Fourteenth Amendment rights by depriving them of property without due process of law;

f.    whether Defendants' seizures and destruction of property owned by Plaintiffs and members of the class violate their civil rights under 42 U.S.C. § 1983 and their substantive due process rights under the Fourteenth Amendment by depriving them of fundamental rights—their homes and their belongings—which are vital to their emotional and physical well-being;

g.    whether Defendants' seizures and destruction of property owned by Plaintiffs and members of the class violate their rights under Article One, Section Fourteen of the Ohio Constitution to be free of unreasonable seizures;

      h.      whether Defendants' seizures and destruction of property owned by Plaintiffs and members of the class violate their due-process rights under Article One, Section Sixteen of the Ohio Constitution;

      i.      whether Defendants' seizures and destruction of property owned by Plaintiffs and members of the class violate their rights to compensation for the government's taking of private property under Article One, Section Nineteen of the Ohio Constitution; and

      j.      whether Defendants' destruction of property owned by Plaintiffs and members of the class violate the City's duties under Ohio Rev. Code § 737.29 to deposit property recovered by the City's police force in a place designated by the mayor, to keep records of such deposited property, to provide Plaintiffs and members of the class an inventory of such property, and ultimately to return it to them.

135.    The claims of the named Plaintiffs are typical of the claims of the class. Defendants have subjected the named Plaintiffs and other members of the class to identical or substantially similar unlawful policies and practices. Defendants' continued pursuit of these unlawful policies and practices puts Plaintiffs and other class members at risk of the further infringement of their rights by Defendants.

136.    Plaintiffs will fairly and adequately protect the interests of the members of the class. Plaintiffs have no interests that are adverse or antagonistic to those of the class because all homeless individuals will benefit from a change to Defendants' policies and practices.

137.    Plaintiffs have retained as counsel the Milton A. Kramer Law Clinic Center of Case Western Reserve University School of Law and the Sremack Law Firm, LLC. Multiple attorney supervisors in the Law Clinic, including one of the undersigned, Andrew.

S. Pollis, are experienced in class-action litigation and can adequately represent the interests of the class members as well as those named as Plaintiffs.

138.    Defendants have acted on grounds generally applicable to both the named Plaintiffs and other class members.  Thus, final declaratory and injunctive relief is appropriate with respect to members of the class.  The injuries suffered by the named Plaintiffs and other class members as a result of Defendants' actions are capable of repetition yet may evade review, thereby making individual and class relief appropriate.

139.    Plaintiffs envision no difficulty in the management of this litigation as a class action.

### CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of Civil Rights Under 42 U.S.C. § 1983
### and the Fourth Amendment to the United States Constitution
### (Right to Be Secure from Unreasonable Seizures)

140.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

141.    Defendants violated Plaintiffs' Fourth Amendment rights to be free from unreasonable seizure of their property by confiscating and then destroying Plaintiffs' property often without notice of the seizure of the property, let alone notice of the destruction of the property.

142.    Defendants seized Plaintiffs' property under a City policy and practice of seizing and destroying the property of homeless citizens.

143.    The APD and ADPS, which executed the property seizures, acted under a City policy and practice and with the specific intent to deprive Plaintiffs of their constitutional rights to be secure in their property.

26

144.    Defendants acted unreasonably in seizing and destroying the Plaintiffs' property without giving them notice of the removal or destruction of their property.

145.    Defendants acted unreasonably by not providing the Plaintiffs with an opportunity to retrieve their property before it was destroyed.  All property was seized and destroyed immediately.

146.    As a direct and proximate consequence of the policies and acts of Defendants and their agents and employees, Plaintiffs have suffered loss of their personal property and are entitled to compensatory damages for that loss.

147.    There is a substantial and continuing controversy between Plaintiffs and Defendants.  Defendants continue the policy, pattern, and practice of unreasonably seizing and destroying Plaintiffs' property.  A declaration of rights is necessary and appropriate to establish that Defendants' seizure and destruction of Plaintiffs' property violates Plaintiffs' Fourth Amendment rights to be secure in their property.

148.    A declaratory judgment and related injunctive relief could protect Plaintiffs from continuing to suffer loss of their property.  Plaintiffs are entitled to declaratory and injunctive relief to prevent the recurrence of Defendants' unreasonable deprivations of Plaintiffs' rights under the Fourth Amendment to the United States Constitution.

## SECOND CAUSE OF ACTION
### Violation of Civil Rights Under 42 U.S.C. § 1983
### and the Fourteenth Amendment to the United States Constitution
### (Right to Procedural Due Process)

149.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

150.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits Defendants from depriving Plaintiffs of life, liberty, or property without due process of law.

27

151.    Plaintiffs have a recognized property interest in their tents and personal belongings stored in these tents.  This property interest is protected by the Fourteenth Amendment.

152.    Defendants knowingly disregarded Plaintiffs' constitutional rights to notification prior to seizing and destroying their personal property.

153.    Defendants never gave Plaintiffs reasonable notice prior to the seizure and destruction of their personal property.

154.    The property sweeps conducted by Defendants deprived Plaintiffs of their property interest because Plaintiffs' personal property was summarily seized and destroyed.

155.    Defendants violated Plaintiffs' procedural due process rights when they seized and destroyed Plaintiffs' personal property without giving Plaintiffs notice of the impending seizure and destruction, which would have afforded Plaintiffs an opportunity to challenge the seizure and destruction or reclaim their belongings.

156.    Defendants' policy and practice of seizing and destroying homeless citizens' property without any notice has no relation to any legitimate local government purpose. Defendants do not have a compelling state interest or rational basis for the policy and practice.

157.    As a direct and proximate consequence of the policies, practices, and acts of Defendants and their agents and employees, Plaintiffs have suffered loss of their personal property and are entitled to compensatory damages for that loss.

158.    Defendants' policy, pattern, and practice of seizing and destroying Plaintiffs' property without proper notice constitutes a substantial and continuing controversy between them.  A declaratory judgment is both necessary and appropriate to establish

that Defendants violated Plaintiffs' Fourteenth Amendment rights to due process by seizing and destroying Plaintiffs' property without proper notice.

159.    A declaratory judgment and related injunctive relief could protect Plaintiffs from continuing to suffer loss of their property without being given proper notice. Plaintiffs are entitled to declaratory and injunctive relief to prevent the recurrence of Defendants' unreasonable deprivations of Plaintiffs' rights under the Fourteenth Amendment to the United States Constitution.

**THIRD CAUSE OF ACTION**
**Violation of Civil Rights Under 42 U.S.C. § 1983**
**and the Fourteenth Amendment to the United States Constitution**
**(Right to Substantive Due Process)**

160.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

161.    Defendants' policy and practice of seizing and destroying Plaintiffs' property deprives Plaintiffs of fundamental rights—their homes and their belongings— which are vital to their emotional and physical well-being.

162.    Defendants knew or should have reasonably known that depriving this vulnerable group of individuals of their homes and personal property would threaten their ability to survive.

163.    Defendants placed Plaintiffs in danger of substantial harm, and Plaintiffs suffered substantial harm as a result of Defendants' policy and practice.

164.    Plaintiffs' interests in survival outweigh Defendants' governmental interests in conducting their policy and practice.

165.    As a direct and proximate consequence of the policies, practices and acts of Defendants and their agents and employees, Plaintiffs have suffered loss of their property and are entitled to compensatory damages for their property.

166.     There is a substantial and continuing controversy arising out of Defendants' policy, pattern, and practice of seizing and destroying Plaintiffs' essential personal property.  A declaratory judgment is both necessary and appropriate to establish that Defendants violated Plaintiffs' substantive due process rights.

167.     A declaratory judgment and related injunctive relief will protect Plaintiffs from continuing to suffer substantial harm that threatens their ability to survive by Defendant's seizure and destruction of Plaintiffs' property.   Plaintiffs are entitled to declaratory and injunctive relief to prohibit Defendants from continuing to violate Plaintiffs' substantive due process rights and protect Plaintiffs from future unconstitutional seizure and destruction of essential property.

### FOURTH CAUSE OF ACTION
### Violation of Civil Rights Guaranteed Under the Ohio Constitution
### (Article I, § 14)

168.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

169.     Article I, § 14 of the Ohio Constitution guarantees the right of people to be secure against unreasonable seizures.

170.     Article I, § 14 of the Ohio Constitution further guarantees that warrants for seizures shall not issue absent probable cause and a particular description of the intended seizure.

171.     Defendants' policy and practice of seizing and destroying Plaintiffs' property violated Plaintiffs' rights to be secure in their persons, houses, papers, and possessions, against unreasonable seizures.

172.     Defendants' policy and practice further violated Plaintiffs' rights under Article I, § 14 by subjecting them to seizures absent any warrant particularly describing the person and things to be seized, and absent any warrant at all.

173.    As a direct and proximate consequence of the policies, practices, and acts of Defendants and their agents and employees, Plaintiffs have suffered loss of their property.

174.    A substantial and continuing controversy exists between Plaintiffs and Defendants since Defendants continue to have the policy, pattern, and practice of unreasonable seizing and destroying Plaintiffs' property without any warrant.  A declaratory judgment is both necessary and appropriate to terminate such policy and practice, otherwise Plaintiffs would continue to suffer loss by Defendants' unreasonable seizure and destruction of Plaintiffs' property.

175.    A declaratory judgment and related injunctive relief will prevent Defendants from continuing to unreasonably seize and destroy Plaintiffs' property. Plaintiffs are entitled to declaratory and injunctive relief to keep them free from the recurrence of Defendants' deprivations of Plaintiffs' rights under Article I, § 14 of the Ohio Constitution.

**FIFTH CAUSE OF ACTION**
**Violation of Civil Rights Guaranteed Under the Ohio Constitution**
**(Article I, § 16)**

176.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

177.    Article I, § 16 of the Ohio Constitution guarantees due process of law for injuries to citizens' property.  It guarantees the administration of justice without denial or delay for such injury.

178.    On information and belief, Defendants' policy and practice of seizing and destroying Plaintiffs' property without notice and an opportunity for a hearing has deprived Plaintiffs of their due process rights.

179.    As a direct and proximate consequence of the policies, practices, and acts of Defendants and their agents and employees, Plaintiffs have suffered loss of their personal property.

180.    The controversy between Plaintiffs and Defendants continues to exist since Defendants have not changed their policy and practice of seizing and destroying Plaintiffs' property without giving notice and an opportunity for a hearing.  A declaratory judgment is both necessary and appropriate to declare that Defendants' policy and practice violates Plaintiffs' due process rights under the Ohio Constitution.

181.    A declaratory judgment and related injunctive relief will prevent Defendants from continuing to seize and destroy Plaintiffs' property without giving notice. Plaintiffs are entitled to declaratory and injunctive relief that prevent the recurrence of Defendants' deprivations of Plaintiffs' due-process rights under Article I, § 16 of the Ohio Constitution.

**SIXTH CAUSE OF ACTION**
**<u>Violation of Civil Rights Guaranteed Under the Ohio Constitution</u>**
**(Article I, § 19)**

182.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

183.    Article I, § 19 of the Ohio Constitution guarantees that compensation be made to the owner when private property is seized by the government.

184.    On information and belief, Defendants' policy and practice of seizing and destroying Plaintiffs' property has never included compensation for the property seized from the affected homeless citizens.

185.    Defendants' policy and practice of seizing and destroying Plaintiffs' property without compensation violated their constitutional rights under Article I, § 19.

32

186.    As a direct and proximate consequence of the policies, practices, and acts of Defendants and their agents and employees, Plaintiffs have suffered loss of their personal property.

187.    A substantial and continuing controversy exists between Plaintiffs and Defendants since Defendants continue to have the policy, pattern, and practice of unreasonable seizing and destroying Plaintiffs' property without any compensation.  A declaratory judgment is both necessary and appropriate to terminate such policy and practice, otherwise Plaintiffs would continue to suffer loss by Defendants' seizure and destruction of Plaintiffs' property.

188.    A declaratory judgment and related injunctive relief will prevent Defendants from continuing to seize and destroy Plaintiffs' property without giving them any compensation.  Plaintiffs are entitled to declaratory and injunctive relief that prevent the recurrence of Defendants' deprivations of Plaintiffs' rights for a just compensation under Article I, § 19 of the Ohio Constitution.

## SEVENTH CAUSE OF ACTION
### Violation of Duties Under Ohio Rev. Code § 737.29

189.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

190.    Ohio Rev. Code § 737.29 provides that a municipal corporation shall deposit property recovered by its police force in a place designated by the mayor, shall keep records of such deposited property, shall provide an inventory of such deposited property to the party from whom it was taken, and, if the property is not claimed within 30 days of its seizure, shall deliver it to the person from whom it was taken.

191.    Defendants failed to comply with any of the requirements of Ohio Rev. Code § 737.29.  Instead, Defendants have typically transported Plaintiffs' property to a landfill or destroyed the property immediately after the seizure.

192.    As a direct and proximate consequence of the policies, practices, and acts of Defendants and their agents and employees, Plaintiffs have suffered loss of their personal property and are entitled to compensatory damages for that loss.

193.    Defendants' policy and practice of destroying Plaintiffs' property constitutes a substantial and continuing controversy regarding the legality of that practice.  A declaratory judgment is both necessary and appropriate to establish that Defendants' policy and practice violate their duties under Ohio Rev. Code § 737.29.

194.    A declaratory judgment and related injunctive relief will prevent Defendants from continuing to illegally destroy property seized from Plaintiffs.  Plaintiffs are entitled to declaratory and injunctive relief to prevent the recurrence of Defendants' illegal conduct.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury, as provided in Fed. R. Civ. P. 38.

## **PRAYER FOR RELIEF**

Plaintiffs request judgment against Defendants as follows:

a.    A class-wide declaration that the City's policy and practice of seizing and destroying homeless citizens' property with insufficient or no notice, without a hearing, and without the opportunity to reclaim such property, violates the United States and Ohio Constitutions and Ohio Rev. Code § 737.29;

b.    A permanent injunction preventing the City from continuing to execute its policy and practice of seizing and destroying homeless

34

citizens' property with insufficient or no notice, without a hearing and without the opportunity to reclaim such property;

c.  Compensatory and consequential damages for each individually named Plaintiff in an amount to be determined at trial;

d.  Punitive damages on all claims allowed by law, in an amount to be determined at trial;

e.  Attorney fees and costs associated with this action; and

f.  Any further relief as this Court deems just and proper and any other relief as allowed by law.

Respectfully submitted,

/s/ Alexander W. Brown
Alexander W. Brown
Legal Intern

/s/ Mengting Chen
Mengting Chen
Legal Intern

/s/ Mary Colleen Geib
Mary Colleen Geib
Legal Intern

/s/ Andrew S. Pollis
Andrew S. Pollis (0046392)
MILTON A. KRAMER LAW CLINIC CENTER
CASE WESTERN RESERVE UNIVERSITY SCHOOL OF LAW
11075 East Boulevard
Cleveland, Ohio 44106
(216) 368-2766
andrew.pollis@case.edu

/s/Rebecca J. Sremack
Rebecca J. Sremack (0092313)
SREMACK LAW FIRM LLC
2745 South Arlington Road
Akron, Ohio 44312
(330) 644-0061
rebecca@sremacklaw.com

*Attorneys and Legal Interns for Plaintiffs*

DATED:  November 6, 2015
3485-PLDG-151106-E-File-Amended Complaint

## CERTIFICATE OF SERVICE

A copy of the foregoing *Amended Complaint for Declaratory and Injunctive Relief and Damages — Class Action* has been filed electronically on November 6, 2015.  Notice of this filing will be sent by operation of the Court's electronic-filing system to all parties indicated on the electronic-filing receipt.  Parties may access this filing through the Court's system.

/s/ Andrew S. Pollis
Andrew S. Pollis (0046392)

/s/ Rebecca J. Sremack
Rebecca J. Sremack (0092313)

*Attorneys for Plaintiffs*

3485-PLDG-151106-E-File-Amended Complaint

37